**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
SYRACUSE DIVISION**

| | |
|---|---|
| ADECCO USA, INC., ADO STAFFING, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Demand for Jury Trial |
| vs. ) | 6:20-cv-744 (MAD/TWD) |
| ) | |
| STAFFWORKS, INC., ANITA VITULLO, ) | |
| KAREN WALSER, VICKI RODABAUGH, ) | |
| DEBORAH ROHDE, MAURICA GLORIA, ) | |
| BRIANNA FLINT, TAYLER FRAVEL, KAREN ) | |
| STANDFORD, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES

Plaintiffs Adecco USA, Inc. and ADO Staffing, Inc. state for their Complaint against Defendants Staffworks, Inc., Anita Vitullo, Karen Walser, Vicki Rodabaugh, Deborah Rohde, Maurica Gloria, Brianna Flint, Tayler Fravel, and Karen Standford (collectively, "Defendants") as follows:

### PARTIES

1. Plaintiff Adecco USA, Inc. is a Delaware corporation with its principal place of business at 10151 Deerwood Park Blvd., Bldg. 200, Ste. 400, Jacksonville, FL. Adecco USA, Inc. is a wholly-owned subsidiary of ADO Staffing, Inc.

2. Plaintiff ADO Staffing, Inc. is a Delaware corporation with its principal place of business at 10151 Deerwood Park Blvd., Bldg. 200, Ste. 400, Jacksonville, FL. Adecco North America, LLC was merged into ADO Staffing, Inc. (Plaintiffs ADO Staffing, Inc. and Adecco USA, Inc., collectively "Adecco") in 2012.

3. Defendant Staffworks, Inc. ("Staffworks") is a New York Corporation with its principal

place of business, main office, and headquarters at 600 French Road, New Hartford, NY 13413.

4.  Defendant Anita Vitullo is an individual who resides at 3533 Craig Rd., Kirkland, NY 13323.

5.  Defendant Karen Walser is an individual and former employee of Adecco who resides at 3927 Aquinnah Heights, Marcellus, NY 13108.

6.  Defendant Vicki Rodabaugh is an individual and a former employee of Adecco who resides at 65 Pine Circle, Horseheads, NY 14845.

7.  Defendant Deborah Rohde is an individual and a former employee of Adecco who resides at 58 Pine Circle, Horseheads, NY 14845.

8.  Defendant Maurica (aka "Mo") Gloria is an individual and a former employee of Adecco who resides at 1211 Clendenning Road, Painted Post, NY, 14830.

9.  Defendant Brianna Flint is an individual and a former employee of Adecco who resides at 309 Magnolia Street, Elmira, NY, 14904.

10.  Defendant Tayler Fravel is an individual and a former employee of Adecco who resides at 377 Valley Road, Pulaski, NY 13142.

11.  Defendant Karen Standford is an individual and a former employee of Adecco who resides at 2512 County Route 45, Fulton, NY, 13069.[1]

## JURISDICTION & VENUE

12.  This Court has subject matter jurisdiction under 28 U.S.C. 1332(a) because: (1) there is complete diversity of citizenship between Adecco and Defendants; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

---

[1] Standford, collectively with Walser, Rodabaugh, Rohde, Gloria, Flint, and Fravel, are referred to as the "Former Employees." The Former Employees collectively with Staffworks, Inc. and Vitullo are referred to as "Defendants."

13.  This Court has subject matter jurisdiction under 18 U.S.C. 1331 because this matter arises under the laws of the United States, including the Defend Trade Secrets Act and Lanham Act.

14.  Venue is proper under 28 U.S.C. 1391(b)(1) because one or more Defendants reside in this district and all Defendants are New York residents. Additionally, venue is proper under 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Alternatively, venue is proper under 28 U.S.C. 1391(b)(3).

## FACTUAL BACKGROUND

I.  **Adecco's legitimate and protectable interests in protecting its relationships, goodwill, proprietary information, business information, and other assets.**

15.  Adecco is a global leader in recruiting, customized and professional consulting, workforce staffing solutions, and training across various industries, including accounting & finance, call center & customer service, creative & marketing, hospitality, human resources, industrial & manufacturing, medical & science, office, clerical & administrative, retail, transportation, and warehousing.

16.  Adecco serves its clients through various staffing, consulting, and training services, including through candidates: recruited to work for clients on a direct-hire basis; or hired by Adecco for temporary placement on a contract basis with clients ("associates"). Adecco helps candidates discover, and connects them with, new roles and opportunities. Personnel hired by Adecco to work internally for Adecco are referred to as "colleagues." Adecco also assists clients through consulting solutions tailored to clients' needs, and providing unrivaled local market knowledge with the support of a global presence. Every day, Adecco has more than 100,000 associates on assignment and 30,000 colleagues working internally to support more than 10,000 clients in the United States and Canada.

17. Adecco's United States operations are divided into regions. The Upstate NY Region includes nine revenue-generating offices in New York: Arcade, Newark, Capital District, Rochester, Greater Buffalo, Syracuse, Jamestown, Elmira, and Lockport, as well as two offices in Canadaigua and Auburn that provide administrative support. The Upstate New York Region was named "Region of the Year" in 2018. The Alleghany Region included[2] ten revenue-generating offices in Pennsylvania: Allentown, Exton, Harrisburg, Scranton Wilkes-Barre, York/Hanover, Goshen, Newburgh, Cranberry, Erie, Pittsburgh DT, and Washington. Adecco's colleagues in these regions, particularly executives, directors, and managers, frequently travel to other offices, service the same client, and collaborate.

18. Adecco has developed proprietary and confidential approaches for capturing, analyzing, and effectively utilizing confidential information for existing and potential clients, candidates, associates, colleagues, and suppliers. It maintains a network of several thousand skilled internal colleagues speaking over a dozen languages, a confidential database of millions of candidates not publicly available (and many of which are extremely difficult to find for a given industry or market), and a confidential database of job postings and descriptions.

19. Adecco invested substantial resources over many years: building a vast universe of existing and potential clients, candidates, associates, and colleagues; pinpointing decision-makers; cultivating relationships; learning, matching, and satisfying specialized needs and preferences; and negotiating creative arrangements and unique pricing. It has also spent many years and substantial resources developing criteria, processes, and strategies for recruiting, vetting, and placing candidates and associates across a wide range of clients, industries, markets, and positions.

---

[2] The offices in the Allegheny Region were recently reorganized into the Mid-Atlantic and Great Lakes Regions.

20. Adecco maintains a robust volume of confidential information in its business, including activity tracking, identity, development, and other data regarding existing and potential clients (and the names of client contacts, decision-makers, and requirements), candidates, associates, and colleagues; terms, conditions, and provisions of client contracts (aka "Terms & Conditions"); specialized training; revenue, profit, margin, pricing, cost, and billing information; billing rates and margins; financial information; new product plans and developments; marketing plans and projections; client and potential client lists; sales promotions and plans; advertising plans and policies; personnel records; and compensation structures and methodologies.

21. This information and these strategies and methodologies are not publicly or readily available, not known or shared in the market, and Adecco has legitimate interests in safeguarding them. Adecco's confidential information; these strategies and methodologies; its goodwill; its existing and potential client, candidate, associate, and colleague relationships; and specialized training are unique, extremely valuable business assets, provide numerous competitive advantages in the market, and could be used by Adecco's competitors to unfairly compete.

22. Adecco maintains databases such as Bullhorn, Custom Match (CM), Smartsearch, and COSMOS (a predecessor of Bullhorn) where confidential and other business information is often stored, which its colleagues including the Former Employees frequently accessed and used.

23. Adecco has made reasonable and diligent efforts to maintain and protect its confidential information and trade secrets including by: (i) storing them in secure, password-protected databases and programs and on secure servers; (ii) requiring personalized passwords and/or two-factor authentication; (iii) limiting distribution or access to persons required to maintain confidentiality and only to the extent necessary to perform their jobs; (iv) security training; (v) requiring as a condition of employment compliance with Employment Agreements, a

Colleague Handbook and Code of Conduct, and various policies and procedures; and (vi) explicitly designating certain items "confidential," "trade secret," and/or "proprietary."

## II.     The Former Employees' Employment at Adecco

24.   The Adecco colleagues in the Upstate New York and Allegheny Regions shared an overlapping base of clients, candidates, and geographic areas, and frequently functioned as one team. These offices had visibility into each other's client base and often shared deals and resources.

25.   ***Walser & Standford's prior employment at TAD.*** Walser and Standford worked for TAD Resources International, Inc. ("TAD"), which is a separate entity from Adecco USA, Inc. and ADO Staffing, Inc., before starting at Adecco. Walser started at TAD in or around September 1989, Standford started there in or around April 1996, and both signed Employment Agreements with TAD. Before starting at Adecco, they were required to sign Employment Agreements with Adecco as a condition of their employment and in exchange for their employment, increased compensation, status, skill, knowledge, and other benefits. Walser signed her Employment Agreement with Adecco on June 18, 1998 and Standford signed hers on June 17, 1998.[3] Walser and Standford's employment with TAD ended on June 30, 1998 and their last pay date with TAD was the same day. Walser and Standford became Adecco employees on July 1, 1998 and their first pay date with Adecco was on July 15, 1998.

26.   ***Walser.*** Walser worked at Adecco for approximately 22 years from July 1, 1998–June 1, 2020. She served as Regional Vice President until April 1, 2019 at which time she was promoted to Senior Regional Vice President. She oversaw a territory that did over $100,000,000 in annual business in the Upstate New York and Allegheny Regions and managed 48 branch offices, on-site & managed service programs, and executive search teams in New York, Ohio, Pennsylvania, and

---

[3] (Ex. 1,  6/18/98 Walser Agreement; Ex.2, 6/17/98 Standford Agreement).

Vermont. She was based in the Syracuse office, but frequently traveled to and worked out of the other regional offices. Her duties included: overseeing all strategic sales and operations in the Regions including overall direction and financial management of all business activities; developing and implementing strategic plans to improve market share and increase revenue; working with area management to develop strategic sales plans; and developing and maintaining relationships with major prospective clients.[4] During her tenure, Walser was eligible for a lucrative bonus structure and received various awards. By 2005, she was overseeing all aspects of employee performance including each employee's "top accounts, relationships with clients, peers and management." That year Adecco provided her the means and resources to assist in "rebuild[ing] and restructure[ing] [the] Upstate NY [Region]." By 2013, she "[m]aintained all of Upstate NY Large accounts." As of late September 2019, at least 32 Adecco colleagues working in the Upstate New York and Allegheny Regions had been hired by her.

27. ***Rodabaugh.*** Rodabaugh worked at Adecco for approximately 18 years from March 18, 2002–June 1, 2020. She was hired as an Account Representative in the Eastern New York Region reporting to Walser. She was promoted to Branch Manager, Senior Branch Manager, and Senior Manager. On May 6, 2019, she was promoted to Area Director where she was in charge of Adecco's Elmira, Corning, Kodak, and Rochester Branches. Her duties included: planning, directing, and controlling all phases of area operations "with a primary emphasis on increasing profit and growing the market[];" preparing and achieving annual business plans; serving as the "key sales person and key contact in large prospects and on all large or on-site accounts;" identifying, pursuing, and developing new accounts through "awareness of the local market [and] competitor activities;" managing branch profits, losses, and budgets; and recruiting, training, and developing Branch

---

[4] (Ex. 3, Walser Job Description).

Managers and staff, including Rohde, Gloria, and Flint.[5]

28. **_Rohde._** Rohde worked at Adecco for about 18 years from July 15, 2002–June 12, 2020. She started as an Office Supervisor, later served as a Recruiter, and was promoted to Lead Recruiter on October 29, 2015. She worked out of the Corning office, on site at an Adecco client located at 1 Riverfront Plaza, Corning NY 14830, and she traveled to and worked out of various other regional offices. Her duties included: sourcing and recruiting candidates to fill temporary, temporary to hire, and/or direct-hire orders for complex and specialized clients; partnering with clients to define needs and objectives; creating and deploying client and role specific recruiting strategies; "[b]uild[ing] and maintain[ing] a comprehensive candidate pipeline that addresses client needs;" serving as a subject matter expert on market trends and target industries; creating and executing temporary employee programs; developing relationships with key clients and business leaders; and training other recruiters. She frequently interacted with and visited Adecco's longstanding and near-permanent clients, "worked hand in hand" with clients, successfully leveraged Adecco's resources to retain new clients and expand existing client relationships, developed a formal training program with important clients, was an integral part of the Corning and Elmira branches, and helped drive sales and profit to among the highest in the Region.

29. **_Gloria._** Gloria worked at Adecco for two years and five months from January 1, 2018–June 9, 2020. She was a Lead Recruiter, was based out of the Corning and Elmira offices, reported to Rodabaugh, and had the same duties as Rohde identified above. She served as administrator of Adecco's Corning Facebook Page and was entrusted with the credentials to the account, had an Adecco-issued cell phone, and had an Adecco-issued iPad for timesheet processing for a client located at 55 Berry Rd, Nichols, NY 13812. Gloria frequently interacted with Adecco's

---

[5] (Ex. 4, Rodabaugh Job Description).

longstanding and near-permanent clients, was an integral part of the Corning and Elmira offices, and helped drive sales and profit to among the highest in the Region.

30. **Flint.** Flint worked at Adecco for one year and four months from January 21, 2019–June 9, 2020. She was a Recruiter, was based out of the Corning and Elmira offices, reported to Rodabaugh, and her duties included: pricing and selling Adecco's portfolio of services; knowledge of branch financial objectives, gross margin, costs, and other metrics; controlling variables impacting branch gross margin; maintaining knowledge of target industries, clients, roles, market share, and competition; sourcing and recruiting candidates for temporary, temporary to hire, and/or direct-hire orders for complex clients; "[b]uild[ing] and maintain[ing] a comprehensive candidate pipeline that addresses client needs;" developing new business and maintaining existing clients; managing the Adecco website; establishing recruitment plans; and training candidates and associates.[6] Flint frequently interacted with Adecco's longstanding and near-permanent clients, conducted multiple client visits per week, participated in daily sales calls, was an integral part of the Corning and Elmira offices, and helped drive sales and profit to among the highest in the Region.

31. **Fravel.** Fravel worked at Adecco as a Lead Recruiter for approximately two years, from June 20, 2018–June 24, 2020. She worked out of the Syracuse office, reported to the Senior Branch Manager there, and had the same Lead Recruiter duties identified above. She frequently interacted with Adecco's longstanding and near-permanent clients and was an integral part of the regional team.

32. **Standford.** Standford worked at Adecco for approximately 22 years from July 1, 1998–June 9, 2020 first as an Office Supervisor and then as a Lead Recruiter with the same duties as

---

[6] (Ex. 5, Flint Job Description).

identified above. She frequently traveled to and worked out of various other offices in the Region including Buffalo. Standford frequently interacted with Adecco's longstanding and near-permanent clients and was an integral part of the regional team.

**III.    The Former Employees agreed to be bound by non-solicitation, non-compete, non-disclosure, and other post-employment obligations as a condition of their employment.**

33.    The Former Employees were provided the means and resources to develop business and goodwill for Adecco, including through access to existing and potential clients, candidates, and colleagues, specialized training, and the financial and other resources to develop these relationships. They frequently used and accessed Adecco's Confidential Information. They were also provided and given access to other specialized trainings,[7] resources, and tools to perform their jobs, enhance their skills, and to further develop relationships and goodwill.

34.    Because the Former Employees would frequently access and use Adecco' Confidential Information and directly interact with longstanding and near-permanent clients, potential clients, associates, candidates, suppliers, and employees—which they did throughout their employment—and given their roles and responsibilities, they were required as a condition of their employment and in consideration for their employment, continued employment, promotion or reassignment, new or additional compensation or status, specialized training, and/or access to new or different confidential information to execute Employment Agreements ("Agreements").[8] Adecco would not have provided access to these various resources, specialized training, and tools had it known they would not honor their Agreements or other obligations.

---

[7] (*See e.g.*, Ex. 6, Credit Card/Adecco University Agreements for Walser and Standford) (acknowledging receipt of confidential "Adecco University" training manuals and support materials).
[8] (*See e.g.*, Ex. 7, 12/13/17 Gloria Offer Letter p. 1) ("As a condition and in consideration of employment, we require all Colleagues to sign all requisite forms including an Employment Agreement containing, among other things, restrictrive covenants."); (Ex. 33, 6/5/18 Fravel Offer Letter p. 1) (same); (Ex. 8, 1/11/19 Flint Offer Letter) (same).

35. ***Duty of Loyalty and Ethical Conduct.*** The Former Employees agreed that while in Adecco's employ they would loyally and faithfully perform their duties in accordance with Adecco's policies, procedures, and guidelines including those regarding business ethics and conflicts of interest, and would not "engag[e] in any other business activity" without consent.[9]

36. ***Confidentiality, Non-Disclosure, & Company Property.*** The Former Employees agreed that except as required by their job they would not disclose, use, copy, or retain any confidential business information or trade secrets of Adecco, its customers, or suppliers ("Confidential Information").[10] Walser, Standford, Rohde, and Rodabaugh's Agreements defined "Confidential Information" as including:

> methods of operation and/or doing business, salary and benefit information and other data regarding Adecco's employees, price lists, sales and recruiting techniques, promotional methods and information, names and lists of clients, prospective clients, and/or employees, the nature and content of client contracts and records, policy and procedures manuals, training methods and manuals, customized computer software, and other information not generally known to the public.[11]

37. Gloria, Fravel, and Flint's Agreements defined "Confidential Information" as "including:"

> trade secrets, know how, research and development, software, systems, databases, inventions, processes, technology, designs and other intellectual property, information regarding the procedures, sales, marketing, pricing and costs, operations, training, finances, investments, profits, products, services, clients, personnel, compensation, recruiting, organization, plans, objectives and strategies, and suppliers of [Adecco], client and candidate preferences, experiences, requirements, course of dealing and purchasing patterns, as well as the name, address, contact persons or requirements of any existing or prospective client, consultant or employee including such information contained in Colleague's social

---

[9] (Ex. 1, 6/18/98 Walser Agreement ¶ 2; Ex. 2, 6/17/98 Standford Agreement ¶ 2; Ex. 9, 7/10/02 Rohde Agreement ¶ 2; Ex. 10, 3/18/02 Rodabaugh Agreement ¶ 2; Ex. 11, 12/13/17 Gloria Agreement ¶ 3; Ex.12, 6/5/18 Fravel Agreement ¶ 3; Ex. 13, 1/1/19 Flint Agreement ¶ 3).

[10] (Ex. 1, 6/18/98 Walser Agreement ¶ 7; Ex. 2, 6/17/98 Standford Agreement ¶ 7; Ex. 9, 7/10/02 Rohde Agreement ¶ 7; Ex. 10, 3/18/02 Rodabaugh Agreement ¶ 7; Ex. 11, 12/13/17 Gloria Agreement ¶¶ 4–5; Ex. 12, 6/5/18 Fravel Agreement ¶¶ 4–5; Ex. 13, 1/1/19 Flint Agreement ¶¶ 4–5).

[11] (Ex. 1, 6/18/98 Walser Agreement ¶ 7; Ex. 2, 6/17/98 Standford Agreement ¶ 7; Ex. 9, 7/10/02 Rohde Agreement ¶ 7; Ex. 10, 3/18/02 Rodabaugh Agreement ¶ 7).

networking accounts concerning the past, current or future business activities and operations of . . . [and] any other information designated as confidential in the applicable [Adecco] policies. Confidential Information also includes all information with respect to the products, services, business or affairs of [Adecco'] clients which is in any way acquired during or by reasons of Colleague's association with such clients during Colleague's employment.[12]

38. They further agreed that any breach of this provision—or the other restrictive covenants—would warrant immediate injunctive relief to prevent further violations in addition to other remedies.[13] Additionally, Gloria, Fravel, and Flint acknowledged and agreed that: (1) Adecco has invested considerable resources in attaining, developing, and protecting its Confidential Information; (2) it is a "valuable asset" that Adecco has "legitimate business interests" in protecting, along with goodwill associated with clients and employees; (3) they would "refrain from directly or indirectly disclosing to any third party, or using for any purpose other than for the direct benefit of [Adecco], any Confidential Information during [their] . . . employ and for the maximum period permitted by law;" and (4) any "unauthorized disclosure or release of such Confidential Information" could irreparably harm Adecco.[14]

39. The Former Employees agreed that upon termination they would "immediately return" all company property.[15] Rohde and Rodabaugh further agreed that upon termination they would "permanently delete all electronic copies of Adecco documents . . . on any personal electronic equipment or media and Adecco customer and employee information . . . and upon Adecco's

---

[12] (Ex. 11, 12/13/17 Gloria Agreement ¶ 4; Ex.12, 6/5/18 Fravel Agreement ¶ 4; Ex. 13, 1/1/19 Flint Agreement ¶ 4).

[13] (Ex. 1, 6/18/98 Walser Agreement ¶ 11; Ex. 2, 6/17/98 Standford Agreement ¶ 11; Ex. 9, 7-10-02 Rohde Agreement ¶ 12; Ex. 10, 3/18/02 Rodabaugh Agreement ¶ 12; Ex. 11, 12/13/17 Gloria Agreement ¶¶ 4–5; Ex. 12, 6/5/18 Fravel Agreement ¶¶ 4–5; Ex. 13, 1/1/19 Flint Agreement ¶¶ 4–5).

[14] (Ex. 11, 12/13/17 Gloria Agreement ¶¶ 4–5; Ex. 12, 6/5/18 Fravel Agreement ¶¶ 4–5; Ex. 13, 1/1/19 Flint Agreement ¶¶ 4–5).

[15] (Ex. 1, 6/18/98 Walser Agreement ¶ 12; Ex. 2, 6/17/98 Standford Agreement ¶ 12; Ex. 9, 7-10-02 Rohde Agreement ¶ 13; Ex. 10, 3/18/02 Rodabaugh Agreement ¶ 13; Ex. 11, 12/13/17 Gloria Agreement ¶ 7; Ex. 12, 6/5/18 Fravel Agreement ¶ 7; Ex. 13, 1/1/19 Flint Agreement ¶ 7).

request will permit Adecco to take reasonable efforts to verify such deletions."[16] Gloria, Fravel, and Flint agreed that to the extent any company property exists on their personal computers, laptops, phones, or other devices, they "agree[] to immediately surrender" them so all company property can be removed.[17]

40.   ***Non-Solicitation & Non-Compete: Walser, Standford, Rodabaugh, Rohde.*** Their Agreements state that:

- **Non-Solicitation of Clients and Employees –** "While working for Adecco and during the twelve months immediately following [their] termination of employment, [they] will not directly or indirectly solicit any of" Adecco's customers or employees for a competing business.[18]

- **Non-Compete –** "[F]or a period of twelve months immediately following termination[] of [their] employment, [they] will not compete against Adecco or associate [them]sel[ves] with any Adecco competitor as an employee, owner, partner, stockholder, investor, agent or consultant" in the "market" in which they "worked or had responsibility for" during the prior: (1) one-and-a-half years (Walser and Standford); or (2) one year (Rodabaugh and Rohde).[19]

41.   Walser, Standford, Rodabaugh, and Rohde's Agreements contain a New York choice-of-law provision, a severability clause, and indicate that all claims would be resolved by binding arbitration; however, they expressly permit immediate injunctive relief as to breaches of the non-disclosure, non-solicitation, and non-compete provisions.[20]

42.   ***Non-Solicitation and Non-Compete: Gloria, Fravel, & Flint.*** The Agreements they

---

[16] (Ex. 9, 7/10/02 Rohde Agreement ¶ 13; Ex. 10, 3/18/02 Rodabaugh Agreement ¶ 13).

[17] (Ex. 11, 12/13/17 Gloria Agreement ¶ 7; Ex. 12, 6/5/18 Fravel Agreement ¶ 7; Ex. 13, 1/1/19 Flint Agreement ¶ 7).

[18] (Ex. 1, 6/18/98 Walser Agreement ¶ 9; Ex. 2, 6/17/98 Standford Agreement ¶ 9; Ex. 10, 3/18/02 Rodabaugh Agreement ¶ 9; Ex. 9, 7/10/02 Rohde Agreement ¶ 9). Rodabaugh and Rohde's Agreement bars solicitation of Adecco employees that are considered "Associates" for twelve months, but states that solicitation of Adecco "Colleagues" is barred for seven months. (Ex. 10, 3/18/02 Rodabaugh Agreement ¶¶ 9–10; Ex. 9, 7/10/02 Rohde Agreement ¶¶ 9–10).

[19] (Ex. 1, 6/18/98 Walser Agreement ¶ 10; Ex. 2, Standford Agreement ¶ 10; Ex. 10, 3/18/02 Rodabaugh Agreement ¶ 11; Ex. 9, 7/10/02 Rohde Agreement ¶ 11).

[20] (Ex. 1, 6/18/98 Walser Agreement ¶¶ 11, 16, 19, 21; Ex. 2, 6/17/98 Standford Agreement ¶¶ 11, 16, 19, 21; Ex. 10, 3/18/02 Rodabaugh Agreement ¶¶ 12, 17, 20, 22; Ex. 9, 7/010/02 Rohde Agreement ¶¶ 12, 17, 20, 22).

"voluntarily and knowingly" executed[21] included post-employment restrictions for 12 months after termination barring them—"directly or indirectly" on behalf of themselves or "another person or entity"—from engaging in or assisting others in the following activities:[22]

- **Non-Solicitation of Employees** – "Soliciting,[23] hiring, recruiting, or attempting to recruit any person employed by or contracted with [Adecco] of whom [they] became aware through [their] employment with [Adecco], at any time during the lesser of the twelve . . . months immediately prior to [their] termination of employment with [Adecco] or the term of [their] employment."

- **Non-Compete –** "Within the Market Area,[24] entering into, engaging in, being employed by, consulting or rendering services for, any business which competes with, or is similar to, [Adecco]'s business at the time of [their] separation from employment with [Adecco], in a capacity performing functions similar to those performed or managed by [them] while employed by [Adecco]."

- **Non-Solicitation of Clients –** "Soliciting, contacting, calling upon, or attempting to call upon, for or on behalf of any business which competes with [Adecco], any established or prospective [Adecco] Client(s) (s)he served or solicited while employed by [Adecco], or any [Adecco] client(s) which were served by [Adecco] in the Market Area of which [they] had access to Confidential Information, at any time during the lesser of the twelve . . . months immediately prior to [their] termination of employment with [Adecco] or the term of [their] employment."

Gloria, Fravel, and Flint further acknowledged that: (1) these restrictions were "tailored to protect [Adecco's] legitimate business interests in light of the Confidential Information to which [they would] have access and [would] not unreasonably restrict [their] ability to secure gainful employment" in their chosen occupation; (2) any breach would cause "irreparable injury" the

---

[21] (*See e.g.*, Ex. 11, 12/13/17 Gloria Agreement; Ex. 12, 6/5/18 Fravel Agreement; Ex. 13, 1/1/19 Flint Agreement) (confirming above their signatures that they executed them "voluntarily and knowingly").
[22] (Ex. 11, 12/13/17 Gloria Agreement ¶ 8(1)–(3); Ex. 12, 6/5/18 Fravel Agreement ¶ 8(1)–(3); Ex. 13, 1/1/19 Flint Agreement ¶ 8(a)–(e)).
[23] "Soliciting" is defined as including "direct and indirect solicitations made through social-networking platforms." (Ex. 11, 12/13/17 Gloria Agreement ¶ 8(4); Ex. 12, 6/5/18 Fravel Agreement ¶ 8(4); Ex. 13, 1/1/19 Flint Agreement ¶ 8 (d)).
[24] "Market Area" means the "50 mile radius of the [Adecco] office(s) to which Colleague [was] assigned or . . . the territory to which Colleague is assigned to work and in which Colleague will have management responsibilities or contact involving any business matter." (Id. ¶ 8).

"value of which would be difficult, if not impossible, to ascertain;" and (3) any breach shall extend the duration from the inception of the breach to when a corresponding remedy is awarded.[25]

43. Gloria, Fravel, and Flint's Agreements contain a Florida choice-of-law provision, a severability clause, and indicate that all claims arising out of the parties' relationships shall be resolved by binding arbitration in the county in which they were last employed; however, they expressly permit immediate injunctive relief in a court of competent jurisdiction.[26] Florida has a direct and relevant relationship to this dispute because Adecco is based in Jacksonville. And there is more than a reasonable basis for the parties' choosing Florida law because it would provide Adecco certainty in defending its rights in suits with employees all over the country.

## IV. Other agreements and policies by which the Former Employees agreed to be bound by as a condition of their employment.

44. The Former Employees each signed an Acknowledgement confirming receipt of Adecco's Handbook, affirming that they read and understood Adecco' policies, and agreeing to be bound.[27] Walser, Standford, Rodabaugh, and Rohde's Agreements expressly incorporated the Handbook "along with any and all modifications" by reference.[28] Gloria, Fravel, and Flint also each signed a Code of Business Conduct Certification confirming receipt, affirming that they read and understood it, and agreeing to be bound.[29] Walser and Standford also signed agreements regarding corporate credit cards they were issued and governing the use of the proprietary Adecco University training manuals and materials they were provided.[30] Additionally, Rodabaugh signed

[25] (Ex. 11, 12/13/17 Gloria Agreement ¶¶ 8(5), 9; Ex. 12, 6/5/18 Fravel Agreement ¶¶ 8(5), 9; Ex. 13, 1/1/19 Flint Agreement ¶¶ 8(e), 9).
[26] (Ex. 11, 12/13/17 Gloria Agreement ¶¶ 13–14, 18, 24–25; Ex. 12, 6/5/18 Fravel Agreement ¶¶ 13–14, 18, 24–25; Ex. 13, 1/1/19 Flint Agreement ¶¶ 13–14, 18, 24–25).
[27] (Ex. 14, Handbook Acknowledgments).
[28] (Ex. 1, 6/18/98 Walser Agreement ¶ 22; Ex. 2, 6/17/98 Standford Agreement ¶ 22; Ex. 10, 3/18/02 Rodabaugh Agreement ¶ 23; Ex. 9, 7/10/02 Rohde Agreement ¶ 23).
[29] (Ex. 15, Code of Business Conduct Certifications for Gloria, Fravel, and Flint).
[30] (Ex. 6, Credit Card/Adecco University Agreements for Walser and Standford).

acknowledgments for Adecco's Internet Usage and Email Policies.[31]

45. By confirming they would abide by Adecco's policies, the Former Employees agreed that: (1) they would not "disclose business secrets or other confidential business plans, materials, financial data, or other non-public proprietary Company information;" (2) they would not "share confidential information regarding business partners, vendors, or customers;" (3) it was unacceptable to use Adecco's computer, email, and internet systems to share "trade secrets such as information regarding the development of systems, processes, products, know-how, technology, client or candidate lists, internal reports, procedures, or other internal business-related communications outside of [Adecco];" and (4) the policies apply to the use of email and the internet, including intellectual property protection, privacy, misuse of company resources, information and data security, confidentiality and conflicts of interest.[32]

**V.    Staffworks' direct competition with Adecco and its prior knowledge of—and malicious interference with—Adecco's: (1) contracts with the Former Employees and other colleagues; and (2) contracts, goodwill, and business opportunities with clients.**

46. Staffworks is a privately-held regional staffing company founded in 1998 with nine branch offices in Central and Southern New York, including Syracuse (2112 Erie Blvd., Suite 400, Syracuse, NY 13324), Utica/New Hartford (600 French Road, New Hartford, NY 13413), Herkimer (320 N. Prospect Street, Herkimer, NY 13350), Rome (800 Black River Blvd., Rome, NY 13440), Oneida, Norwich (24 Conkey Ave., Norwich, NY 13815), Binghamton (8 Hawley Street, Binghamton, NY 13901), Oneonta, and Corning. Staffworks' founder, owner, President, and CEO is Anita Vitullo.

47. Staffworks directly competes with Adecco in the Central and Southern New York markets with temporary placement, temporary-to-permanent placement, direct placement, shared

---

[31] (Ex. 32, 3/18/02 Rodabaugh Internet Usage/Email Policy Acknowledgment).
[32] (Ex. 31, Handbook Excerpts pp. 2–3, 8–10, 15, 17).

services, on-site managed services, and other workplace solutions across all industries including medical, scientific, industrial, and office administration. For years, Staffworks has considered Adecco to be its primary competitor.

48.  Before hiring the Former Employees in June 2020, which is further discussed below, Staffworks had three or four small accounts in Elmira, no accounts in Corning, and no offices in Elmira, Corning, or Ithaca. Throughout 2019–2020, Vitullo repeatedly told Staffworks' employees, including former VP of Business Development Chris Lasky, that Staffworks had *no interest* in opening offices in Elmira or Corning.

49.  Staffworks has known for years that Adecco requires executives, directors, managers, and recruiters to execute—as a condition of their employment—employment agreements with post-employment non-compete, non-solicitation, and non-disclosure obligations.

50. Staffworks' policy and practice is to request and obtain employment agreements prospective employees have with other companies, including in interviews conducted by Vitullo, Senior VP of Operations Todd Consilio, outside CFO Vince Tramacera, and HR Manager Jennifer Williams. Prior to June 2020, Staffworks hired at least four former Adecco employees—including former Adecco Regional Sales Director Chris Lasky who Staffworks hired as VP of Business Development in June 2019—and requested and received each of their Employment Agreements.

51.  As of June 1, 2020 and at all relevant times, Staffworks had actual and constructive knowledge of the restrictive covenants in Adecco's Employment Agreements. It also knew they were valid and enforceable and never expressed a belief otherwise. By June 1, 2020 and at all relevant times, Walser, Standford, Rodabaugh, and Rohde each had actual and constructive knowledge of the obligations in each of the Former Employees' Agreements, particularly considering that they entered into these agreements themselves, Walser sometimes countersigned

them on behalf of Adecco, and Walser often communicated with departed employees including Lasky about the nature and scope of their post-employment obligations.[33]

52. When Staffworks hires new employees with employment agreements containing restrictive covenants, it is Vitullo's practice—regardless of the nature and scope of the obligations—to instruct them to "disregard" and not "worry about" them because she has a "standard form response letter" that "shut[s] it down." She also tells them that although she has "never had to deal with such a situation further" after sending this standard form response letter, and that if a dispute were to arise she would "back [them] 100%" and "pay any legal fees incurred as a result." One example of when Vitullo employed this practice before June 1, 2020 was when Staffworks hired Lasky. Upon information and belief, when Vitullo hired the Former Employees in June 2020 she made the same or similar statements and demonstrated the same intentional and malicious disregard for valid and enforceable post-employment obligations.

53. Even when new employees are contractually prohibited, Staffworks and Vitullo makes it a condition of their employment that they will commit to solicit or attempt to solicit every account that they serviced on behalf of their former employer in the Central and Upstate New York areas. Staffworks made this a condition of Lasky's employment when it hired him with regard to former accounts he serviced at Adecco and, upon information and belief, it made this a condition of the Former Employees' employment.

54. When Staffworks and Vitullo interview, hire, and on-board new employees, they provide no instruction about not bringing confidential information, company property, or trade secrets from a prior employer. Instead, Vitullo expressly and/or impliedly directs and encourages them to bring confidential information from prior employees and utilize it on behalf of Staffworks

---

[33] (Ex. 16, Lasky Employment Agreement) (countersigned by Walser on behalf of Adecco).

to unfairly compete. Upon information and belief, she did this when hiring the Former Employees.

55.  Throughout 2019–2020, Vitullo frequently discussed her plan to dramatically expand Staffworks' business over the next three years including with Lasky. She was determined to achieve this by any means including unfairly competing and maliciously interfering with valid contracts and business opportunities. Although Staffworks and Vitullo had no interest in opening an office in Corning before hiring the Former Employees, they have now opened or are opening an office there to facilitate Defendants' solicitation of, and interference with, Adecco's relationships.

56.  Below are examples of longstanding and near-permanent Adecco clients in the Central and Southern New York markets that Staffworks had no pre-existing relationship with before the Former Employees were hired—which a former employee of Staffworks has independently confirmed—and that Defendants are directly soliciting, contacting, and calling upon on behalf of Staffworks:

    a)  A client located at 112 Industrial Park Rd., Elkland PA 16920. Staffworks pursued this business in the past, but was unsuccessful. Staffworks and Vitullo hired Rohde, Gloria, and Flint to solicit it given their extensive knowledge of: Adecco's Confidential Information concerning the client; and the client's needs, preferences, decision-makers, and operations.

    b)  A client located at Felix Schoeller. Staffworks pursued this business in the past, but was unsuccessful. Staffworks and Vitullo hired Walser and Standford to solicit it given their extensive knowledge of: Adecco's Confidential Information concerning the client; the client's needs, preferences, decision-makers, and operations; and that Standford sat on-site there and it is in close proximity to her home.

    c)  A client located at 1 Riverfront Plaza, Corning NY 14830. Staffworks had pursued this business in the past, but was unsuccessful. Staffworks and Vitullo hired Walser and Rodabaugh to solicit it given their extensive knowledge of: Adecco's Confidential Information concerning the client; the client's needs, preferences, decision-makers, and operations; and that Rodabaugh owned and managed this relationship at Adecco. Walser has acknowledged that she and Adecco specifically built an office in Elmira to facilitate and grow this relationship—and she is now attempting to do the same thing for a competitor

while using Adecco's Confidential Information and trade secrets to unfairly compete.

d) A client located at 192 Patterson Blvd., Towanda, PA 18848. Staffworks had pursued this business in the past, but was unsuccessful. Staffworks and Vitullo hired Walser, to solicit it given that she owned the relationship at Adecco and her extensive knowledge of: Adecco's Confidential Information concerning the client; and the client's needs, preferences, decision-makers, and operations.

e) A client based at 488 State Route 5 Elbridge NY 13060, and with locations at 488 State Route 5, Elbridge NY 13060, 7528 State Fair Blvd., Baldwinsville NY 13027, 700 Visions Drive Skaneateles Falls, NY 13153, and 2170 Ellis Drive Auburn, NY 13021. Staffworks had pursued this business in the past, but was unsuccessful. Staffworks hired Walser and Fravel to solicit it given their extensive knowledge of: Adecco's Confidential Information concerning the client; and the client's needs, preferences, decision-makers, and operations.

f) A client located at 830 Talmadge Hill Rd S., Waverly NY 14892. Staffworks had pursued this business in the past, but was unsuccessful. Staffworks and Vitullo hired Walser, Rohde, Gloria, and Flint to solicit it given their extensive knowledge of: Adecco's Confidential Information concerning the client; and the client's needs, preferences, decision-makers, and operations.

g) A client located at 110 N. Main St, Suite 299, Horseheads, NY 14845. Staffworks had pursued this business in the past, but was unsuccessful. Staffworks hired Walser, Rohde, Gloria, and Flint to solicit it given their extensive knowledge of: Adecco's Confidential Information concerning the client; and the client's needs, preferences, decision-makers, and operations.

h) A client located at 1728 Burnet Avenue Syracuse NY 13206. Staffworks had pursued this business in the past, but was unsuccessful. Staffworks and Vitullo hired Walser and Fravel to solicit it given their extensive knowledge of: Adecco's Confidential Information concerning the client; and the client's needs, preferences, decision-makers, and operations. Walser described this as the "biggest business in town" and "one of [Adecco's] top accounts" whose business the company expanded to Canada and Boston.

i) A client located at 1 Turtle Cir., Horseheads NY 14845. Staffworks had pursued this business in the past, but was unsuccessful. Staffworks and Vitullo hired Walser, Rohde, Flint, and Gloria to solicit it given their extensive knowledge of: Adecco's Confidential Information concerning the client; and the client's needs, preferences, decision-makers, and operations.

j) A client located at 55 Berry Rd, Nichols, NY 13812. Staffworks had pursued business this business in the past, but was unsuccessful. Staffworks and Vitullo hired Walser, Rohde, Gloria, and Flint to solicit it given their extensive knowledge of: Adecco's Confidential Information concerning the client; and

the client's needs, preferences, decision-makers, and operations.

k) Various clients serviced by Adecco's Jamestown office, including clients located at 1 Cliffstar Ave., Dunkirk, NY 14048, 1 Mason Dr., Jamestown, NY 147018, 105 Water St., Jamestown, NY 14701, 105 Water St., Jamestown, NY 14701, and 4515 Gleason Rd., Lakewood, NY 14750. The Former Employees were brought on to pursue these clients given their extensive knowledge of: Adecco's Confidential Information concerning these clients; and the clients' needs, preferences, decision-makers, and operations.

l) Various clients serviced by Adecco's Rochester office, including clients located at 10 White St., Rochester, NY 14608, Edwards Deming Dr., Rochester, NY 14606, and 1385 Fairport Rd., Fairport, NY 14450. The Former Employees were brought on to pursue these clients given their extensive knowledge of: Adecco's Confidential Information concerning these clients; and the clients' needs, preferences, decision-makers, and operations.

m) Various clients serviced by Adecco's Lockport office, including clients located at 1 Ice Cream Plaza, Akron, NY 14001, 7389 Lake Rd., Appleton, NY 14008, and 97 Witmer Rd., North Tonawanda, NY 14120. The Former Employees were brought on to pursue these clients given their extensive knowledge of: Adecco's Confidential Information concerning these clients; and the clients' needs, preferences, decision-makers, and operations.

n) Various clients serviced by Adecco's Syracuse office, including a client located at 1200 State Fair Blvd., Syracuse NY 13209. The Former Employees were brought on to pursue these clients given their extensive knowledge of: Adecco's Confidential Information concerning these clients; and the clients' needs, preferences, decision-makers, and operations.

o) Various clients serviced by Adecco's Capital District office, including clients located at 2160 Amsterdam Rd, Glenville NY 12302, 3169 NY-145, East Durham, NY 12423, and 45 Discovery Dr., Rensselaer, NY 12144. The Former Employees were brought on to pursue these clients given their extensive knowledge of: Adecco's Confidential Information concerning these clients; and the clients' needs, preferences, decision-makers, and operations.

p) Various clients serviced by Adecco's Newark office, including clients located at 300 Forge Ave, Geneva, NY 14456 and 2000 Technology Parkway, Newark NY 14513. The Former Employees were brought on to pursue these clients given their extensive knowledge of: Adecco's Confidential Information concerning these clients; and the clients' needs, preferences, decision-makers, and operations.

**VI.    Walser forcibly broke into two locked filing cabinets shortly after learning of her impending involuntary termination and then—during her final hours on her last day— stockpiled Adecco's Confidential Information and trade secrets including comprehensive data on 531 clients and 166 colleagues.**

57.    On or about May 13, 2020, Adecco implemented a reduction-in-force as a result of a reorganization of its business and based on unanticipated conditions caused from COVID-19. Walser and Rodabaugh were notified that their positions were being eliminated that day.

58.    On May 13, 2020 at 8:52:18 pm, shortly after being notified of her impending involuntary termination, Walser and her husband entered Adecco's Syracuse office (225 Greenfield Pkwy, Suite 111, Liverpool, NY 13088).[34] While cleaning out Walser's office—with nobody else there and without authorization—Walser and her husband forcibly broke into two locked filing cabinets by drilling through the locks to remove colleague personnel files and other Adecco documents containing Confidential Information:[35]



No electric tools capable of drilling through wood or metal are kept in the Syracuse office. Rather, they specifically brought a drill for the purpose of breaking through the locks and forcibly gaining access. Walser also removed everything from her office except for the furniture. Although Walser's conduct was not immediately discovered due to circumstances from the COVID-19 pandemic, she admitted to the Senior Branch Manager that she and her husband "drill[ed] the

---

[34] (Ex. 17, Key Card Access Report p. 1).
[35] (Ex. 30, Filing Cabinet Pictures).

locks."

59.  On May 21, 2022 at 10:44:04 pm, Walser used her Key Card to enter the main door of Adecco's Syracuse office.[36] Six minutes later, at 10:52:12 pm, Standford entered.[37]

60.  Walser and Rodabaugh's last day at Adecco was June 1, 2020. Walser's Adecco email account reflects numerous emails forwarded to her personal email account or her husband's work account full of Adecco's Confidential Information and trade secrets. Below are some examples from Adecco's preliminary investigation.

61.  At 1:31 pm, Walser forwarded an email previously sent to Adecco's VP of Finance on February 24, 2020 with the names of an Adecco client located at 300 Forge Ave, Geneva, NY 14456 in the subject and with the body containing confidential margin, pricing, and cost information. Two spreadsheets were attached:  (1) "**[REDACTED]** WC 2018 2018 to current.xls," which identified 30 Adecco associates and years of workers' compensation claim, payment, and cost information highly relevant to Adecco's profitability; and (2) "**[REDACTED]** Agency Payrates at **[REDACTED]**-**[REDACTED]** Q4 2019-2020.xlsx," which contained client pricing information.



62.  At 5:42 pm, Walser forwarded two emails—one to her personal account and another to her husband's work account—with the subject "Sales Colleagues KPIs Report 05.31.20." Walser received the original email at 5:22 pm, after the close of business on her last day, and weeks after she cleaned out her office. The email and "Sales Colleagues KPIs 05.31.20.xlsx" attachment

---

[36] (Ex. 17, Key Card Access Report).
[37] (Id. p. 2).

contained, among other things: (1) a "New Client Weekly Trend" tab listing sales data for **531 clients** sortable by relationship owner, position, and last job, as well as a summary list of top performing new clients, sales figures, and revenue trend data, (2) a list of **166 colleagues** organized by new client and revenue generation and sortable by position, region, area, start date, and employment status, as well as related trends; and (3) a summary of company-wide data regarding client visits, client proposals, client wins, "Effectiveness" ratio (new clients/visits), breakdown of total business activity, and new clients billed, including targets and trends.



63. Walser failed to return and is still in possession of numerous other emails and documents full of Adecco's Confidential Information and trade secrets that she sent outside the company before departing. This includes the 2020 business plans for six offices: (1) Beachwood, Ohio ("Beachwood Planning Worksheet.xlsx"); (2) Sandusky, Ohio ("Sandusky Planning Worksheet.xlsx"); (3) Jamestown, New York ("Planning Worksheet Jamestown (2).xlsx"); (4) Buffalo, New York ("Planning Worksheet Buffalo,xlsx"); (5) an on-site office for an Adecco client located at Felix Schoeller ("Felix Planning Worksheet rev (003).xlsx"); and (6) Arcade, New York ("Copy of Planning Worksheet rev 2.xlsx"). These were attached to emails Walser forwarded to her husband's work account before her termination. They contain branch client lists (except for the on-site office), employee lists, and critical metrics from 2019 (including sales, profit, margin, sales risks, and placement data) for 2020 strategic planning.

64. Rodabaugh executed a Severance Agreement with Adecco on June 1, 2020 that

became effective on June 9, 2020. On June 3, 2020 at 3:41 pm, Walser also signed a Severance Agreement with Adecco—but she revoked it two days later before it became effective. Rodabaugh's Severance Agreement provided for various payments from Adecco in exchange for a release and agreement to several terms, including:

- to return all company property by her termination date, including her laptop and other tangible property and Confidential Information, and a representation and warranty that she would not retain electronic or physical copies;

- to "immediately surrender" personal electronic devices if any Company Property existed on them;

- an acknowledgement that her Employment Agreement "shall continue to apply," including as to the restrictive covenants that remained "independent of any other rights and obligations of the parties" set forth;

- affirmation of "intent to abide by the terms" of the restrictive covenants and other obligations in her Employment Agreement;

- tolling of the restrictive covenants for the duration of any such breach;

- prohibition on use of Adecco's intellectual property, including its "name, marks[s], and logos," or of her former employment "for the purpose of advancing the commercial interests" of herself or anyone else's behalf;

- that Adecco "shall be completely relieved" of making further payments if she breached the restrictive covenants or other terms; and

- that any disputes would be governed by Florida law. [38]

65.  On June 5, 2020, Adecco made its first installment payment to Rodabaugh.

66.  Between June 1–8, 2020, Walser became employed by Staffworks in a position performing functions identical or substantially similar to her prior role at Adecco. On June 8, 2020, Staffworks' owner confirmed in a text message that Walser was working at Staffworks. This was formally announced to the company that day. Upon information and belief, Staffworks solicited

---

[38] (Ex. 18, Rodabaugh Severance Agreement, ¶¶ 4, 6–8, 10, 14, 22).

Walser to work at Staffworks after receiving her Agreement and while knowing it would violate her restrictive covenants and other obligations owed to Adecco.

67. Staffworks hired Rodabaugh and Standford within a week of hiring Walser into positions where they are performing functions identical or substantially similar to their prior roles at Adecco. Standford's title is "Operations Supervisor."[39] Upon information and belief, Staffworks and Walser solicited Rodabaugh and Standford to work at Staffworks after receiving their Agreements (and Rodabaugh's Severance Agreement) knowing it would violate their restrictive covenants and other obligations owed to Adecco. Walser made or participated in Staffworks' decision to hire Rodabaugh and Standford.

68. From May 13, 2020–June 1, 2020, unbeknownst to Adecco, Walser gathered and retained all or a significant portion of the financial reports for the Syracuse and other offices, including Sales Analysis documents maintained by the Syracuse Branch Manager that listed past, present, and prospective clients.

## VII.    The Former Employees immediately begin soliciting—and making false statements to— Adecco's clients and colleagues.

69.  Immediately upon starting at Staffworks, Walser began soliciting a longstanding and near-permanent Adecco client located at Felix Schoeller—which Adecco received millions in annual revenue from—and interfering with Adecco's contracts and opportunities with the client. This severely damaged Adecco's relationship and goodwill. At first, this caused the client to solicit bids from Staffworks and other competitors, as well as renegotiate pricing on an existing contract with Adecco resulting in tens of thousands in annual lost revenue. On July 1, 2020, the client's VP of Operations sent a letter to Adecco announcing that it "selected Staffworks to serve as [its]

---

[39] (Ex. 19, *See* 6/30/20 Press Release) (quoting "Karen Standford, operations supervisor for Staffworks").

staffing provider moving forward" and "all assignments" would be transitioned by August 2.[40] The letter also asked Adecco fill out a spreadsheet and provide it to Standford by "no later than" July 6.[41]

70.    On June 8, 2020, Gloria informed a longstanding and near-permanent Adecco client located at 830 Talmadge Hill Rd S., Waverly NY 14892 that Adecco was "coming through and cleaning house." Adecco learned of this from the client on June 19, 2020.

71.    On June 9, 2020 at 1:49 pm, Gloria resigned effectively immediately, without notice, and while concealing that she was leaving to take a Branch Manager position at Staffworks. Staffworks hired her between June 8–15 and she is performing functions identical or substantially similar to her prior role at Adecco.[42] Upon information and belief, Staffworks, Walser, Rodabaugh, and Stanford solicited Gloria to work at Staffworks after receiving her Agreement and while knowing it would violate Gloria's restrictive covenants and other obligations owed to Adecco. Walser, Rodabaugh, and Stanford made or participated in Staffworks's decision to hire Gloria.

72.    One June 9, 2020 at 3:12 pm, Flint resigned effectively immediately, without notice, and while concealing that she was leaving to take a Client Manager position at Staffworks. Her resignation email was nearly identical to Gloria's. Staffworks hired her between June 8–15 and she is performing functions identical or substantially similar to her prior role at Adecco.[43] Upon information and belief, Staffworks, Walser, Rodabaugh, and Stanford solicited Flint to work at Staffworks after receiving her Agreement and while knowing it would violate Flint's restrictive covenants and other obligations owed to Adecco. Walser, Rodabaugh, and Standford made or

---

[40] (Ex. 20, 7/1/20 Clements Letter).
[41] (Id.).
[42] (*See e.g.*, Ex. 21, 6/16/20 Walser Email).
[43]    (Ex. 21, 6/16/20 Walser Email); (Ex. 22, 6/22/20 Flint LinkedIn) (identifying title as "Client Manager at Staffworks, Inc.").

participated in Staffworks's decision to hire Flint.

73. On June 10, 2020, Rohde falsely informed a longstanding and near-permanent Adecco client located at 830 Talmadge Hill Rd S., Waverly NY 14892 that Flint and Gloria "were fired"—despite knowing that both abruptly resigned two days earlier and coordinated their resignations.

74. On June 10, 2020 at 3:55 pm, Walser texted the Senior Branch Manager of Adecco's Syracuse and Auburn offices stating that Walser had "some news" and that "it would be good to connect." During a call that began at 5:55 pm, Walser: (1) expressed significant concern about whether anyone at Adecco was told about the prior text; (2) said she was "asked to build a business and to add to a business;" (2) confirmed she was working for a competitor but said "I can't tell you [who] right now" and "[l]egally, I am not supposed to be talking to anyone;" (3) stated, "Adecco is closing more offices and all the feeder branches," which was false, and "I am so glad that I am not there anymore because I could never do what they are doing to people;" (4) "Be aware! Be careful! Protect yourself! Protect your team! They are closing more branches in the next 2 months. No one is safe! Keep all your options open! I will always be here but watch your back!;" (5) Adecco is "getting rid of all the recruiters" and "[t]hey don't care about the small businesses anymore," which was also false; (6) "Let's keep the lines of communication open. I want to protect you. I can't say too much right now but if something were to happen to you – perhaps things are waiting for you. Do you get what I am saying?;" and (7) "Let's get together next week and go for a long walk and I can explain more."

75. On June 11, 2020, Rodabaugh solicited a longstanding and near-permanent Adecco client located at 112 Industrial Park Rd., Elkland PA 16920 during a meeting, which Adecco learned of from the client during the week of June 15. Specifically, the client said it was "bringing on another vendor, if you know what I mean." The other vendor was Staffworks.

VIII. **Defendants hijacked the Adecco Corning Facebook Page while willfully infringing Adecco's trademark and goodwill, continued raiding numerous clients and colleagues, stole the only copies of client contracts from the Elmira-Corning office, sabotaged payroll, and failed to return 11 Adecco-issued devices for weeks.**

76. Adecco maintains Facebook accounts and business pages for its regions and branch offices. The pages are publicly accessible without a Facebook account. Among other things, the pages are used to: connect with, engage, and message existing and potential candidates, associates, clients, colleagues, and suppliers; promote and share updates about Adecco and its regional and branch offices; and post job and placement opportunities. The pages also explicitly display Adecco's name, logo, advertising and marketing materials, and intellectual property.

77. In January 2014, Adecco created and maintained a Facebook pages for its Elmira–Corning, New York branch ("Adecco Corning Facebook Page"). As of early June 2020, the Adecco Corning Facebook Page had approximately 2,010 "likes" and 2,035 followers. Gloria served as the administrator and had the username and password.

78. On June 12, 2020 at 12:55 pm, Adecco discovered that Gloria—without Adecco's knowledge or authorization—hijacked the Adecco Corning Facebook Page by changing the password, as well as the page name to "Fingerlakes Staffing."



79. Adecco's cover photo was removed at 12:42 pm. The "About" section continued to show the company as a "Staffing Agency" and a location of "Corning, New York 14830." It also still showed Adecco's trademarked name (U.S. Reg. No. #5,922,639, registered November 26,

2019); the 2,010 likes and 2,035 followers generated by Adecco over the prior six-and-a-half years; and its posts, images, logos, advertising materials, and other content from inception. Below is one example from June 12, 2020 at 12:55 pm:



80. Defendants' use of Adecco's registered trademark in content that appeared under the "Fingerlakes Staffing" name—and in connection with services that were identical or closely related to those provided by Adecco—created a likelihood of confusion among existing and potential clients, candidates, associates, colleagues, and suppliers, and caused them to be confused, mistaken, or deceived, as to whether "Fingerlakes Staffing," Defendants, and/or their services were affiliated with, approved by, in partnership with, originated from, or associated with Adecco.

81. Defendants hijacked Adecco's Adecco Corning Facebook Page to unfairly compete in various ways, including to: interfere with Adecco's relationships; misappropriate the valuable goodwill and intellectual property that Adecco built up over many years; and falsely create the perception that Adecco's name, location, likes, followers, posts, and content were associated with Defendants and/or that Adecco's operations in the area were shutting down.

82. On June 12, 2020 at 1:55 pm, Rohde resigned "effective immediately," without notice,

and while concealing that she would be working for Staffworks. Rohde's resignation email was nearly identical to Gloria and Flint's. That same day, Rohde told an Adecco client located at 830 Talmadge Hill Rd S., Waverly NY 14892 that "she didn't know how [Adecco] would be able to process [the client's] payroll." Defendants also specifically asked this client to move the business to Staffworks because "Adecco's going down financially." Staffworks hired Rohde between June 8–15 where she is performing functions identical or substantially similar to her prior role at Adecco.[44] Upon information and belief, Staffworks, Walser, Rodabaugh, and Standford solicited Rohde to work at Staffworks after receiving her Agreement and/or while they knew it would violate Rohde's restrictive covenants and other obligations owed to Adecco. Walser, Rodabaugh, and Standford also made or participated in Staffworks' decision to hire Rohde.

83. Following their resignations, Adecco discovered that, in an attempt to sabotage Adecco's client relationships and business, in the last couple of weeks while employed by Adecco, Rodhe, Gloria, and Flint purposefully failed to onboard candidates or enter their information in the payroll system. Adecco learned that Rodhe, Gloria, and Flint had placed multiple associates on assignment with a client but had intentionally not entered their information into the system so as to create problems with payroll. As a result, Adecco had to perform an emergency audit to clear up the onboarding and payroll issues. Upon information and belief, Rodhe, Gloria, and Flint did this so that they could later point to this situation as an example of how "Adecco is going downhill" in an attempt to solicit that client's business on behalf of Staffworks. In fact, shortly after this incident, this client decided to begin working with Staffworks.

84. On June 12, 2020, Adecco asked Facebook to shut down the Adecco Corning Facebook Page. The page was temporarily shut down later that week. However, Defendants

---

[44] (*See e.g.*, Ex. 21, 6/16/20 Walser Email).

reactivated it at some point June 15 at 10:50 am and June 16 at 9:00 am. Again, it also still showed Adecco's trademarked name; the 2,010 likes and 2,035 followers generated by Adecco over the prior six-and-a-half years; and its posts, images, logos, advertising materials, and other content from inception. Below is another example of infringing content from June 16 at about 9:00 am:



85. On June 16, 2020 at 8:01 am, Walser emailed Staffworks HR Manager Jennifer Williams from her Staffworks email address with employee onboarding instructions for Rohde and Flint.[45] Walser copied Rohde and Flint, but inadvertently sent it to their Adecco accounts. She also said she, Rodabaugh, and Gloria "will be at client meetings and looking at office space:"

From: Karen Walser <KWalser@staffworkscny.com>
Sent: Tuesday, June 16, 2020 8:01 AM
To: Jennifer Williams <JWilliams@staffworkscny.com>
Cc: Vicki Rodabaugh <VRodabaugh@staffworkscny.com>; Gloria, Maurica <Maurica.Gloria@adeccona.com>; Flint, Brianna <Brianna.Flint@adeccona.com>
Subject: Today

Good morning Jenn!
Are you able to call Deb/Bri today at 9:00.
We are hoping that you can work on Payroll training and get Debs computer up and running.

Vick, Mo and I will be at client meetings and looking at office space.


Sent from my iPhone

86. After receiving this, Adecco notified Rodabaugh that "[b]ased on the numerous violations of [her] restrictive covenants" it decided to place her severance payments on hold until further notice while reserving the right to demand repayment and any other available remedies.[46]

87. At or about the time that Walser, Rodabaugh, and Gloria were at these "client meetings" on June 16, an Adecco client located at 112 Industrial Park Rd., Elkland PA 16920 informed Adecco that it would be re-examining the relationship and requested a copy of the Terms

---

[45] (Ex. 21, 6/16/20 Walser Email).
[46] (Ex. 23, 6/18/20 Adecco Letter to Rodabaugh).

& Conditions. The client later informed Adecco that Rodabaugh had a meeting with the Plant Manager the week before "to discuss the business." Defendants also falsely told this client that a particular Adecco representative would no longer be servicing the account.

88.  On June 18, 2020, Staffworks' former VP of Business Development confirmed Walser was working with Rodabaugh and Standford at Staffworks and was "already contacting Syracuse's largest accounts," including a client located at 1 Riverfront Plaza, Corning NY 14830. At 4:05 pm, an Adecco client at 1728 Burnet Avenue Syracuse NY 13206 informed an Adecco Senior Branch Manager that he had been approached by Walser about the business.

89.  One June 19, 2020, an Adecco client located at [1 Turtle Cir., Horseheads NY 14845] abruptly and unexpectedly asked Adecco to release its sub-vendor servicing the account and threatened to bring in another vendor.

90.  On June 19, 2020 at 2:26 pm, Defendants changed the name of the Adecco Corning Facebook Account from "Finger Lakes Staffing" to "Staffworks Upstate NY & Northern PA" but while still operating it through the original Adecco Corning Facebook Page. It also still showed Adecco's trademarked name; the likes and followers generated over the prior six-and-a-half years; and the posts, images, logos, advertising materials, and other content from inception. This continued until June 22, 2020 at which time Defendants shut it down. Adecco has been unable to access the Adecco Corning Facebook Page since June 8, 2020 and its likes, followers, and content generated over six-and-a-half years are neither visible to the public nor accessible by Adecco. Visitors now receive an error message when attempting to view the page.

91.  Defendants' use of Adecco's registered trademark in content that appeared under the "Fingerlakes Staffing" and "Staffworks Upstate NY & Northern PA" names—and in connection with staffing services identical or closely related to those provided by Adecco—created a

likelihood of confusion among existing and potential clients, candidates, associates, colleagues, and suppliers, and caused them to be confused, mistaken, or deceived, as to whether Defendants or their services were affiliated with, approved by, in partnership with, originated from, or associated with Adecco.

92. On June 20, 2020, shortly after Defendants shut down the Adecco Corning Facebook Page, they created a new one called "Staffworks Upstate NY & Northern PA." A 7:16 pm post that day introduced Gloria as "Branch Manager" and Flint as "Client Manager," described them as "two new members of Staffworks . . . excited to help you with your next career," and invited viewers to contact them for "opportunities in your area."

93. Defendants have engaged in various efforts to promote services on the Staffworks Upstate NY & PA Facebook Page in direct competition with Adecco. For instance: a June 20 4:55 pm post stated that "[w]e are a premiere provider of contingent workforce solutions and professional staffing services in Upstate NY and Northern PA;" Flint shared the page on June 20 at 4:57 pm asking to "[p]lease like and share our new page;" Gloria shared it at 5:39 pm that day in a "woodhull sales" forum; and Flint shared it at 5:59 pm that day asking people to participate in "our first giveaway;" and on June 22 Flint shared a Staffworks-logoed image titled "Production, Assembly, and Shipping Positions Available."

94. Despite working for Staffworks and soliciting Adecco's clients and employees on its behalf, Walser's public LinkedIn profile identified her as "Sr. Regional Vice President at Adecco Staffing, USA" through June 22, 2020.[47] When Walser updated it on June 22, she changed it to "Sr. Vice President" at "USA"—instead of Staffworks—to attempt to further conceal her conduct.[48]

---

[47] (Ex. 24, 6/21/20 Karen Walser LinkedIn; Ex. 25, 6/22/20 Karen Walser LinkedIn)
[48] (Ex. 25, 6/22/20 Karen Walser LinkedIn).

95.  During a June 22, 2020 meeting between Adecco and a client located at 112 Industrial Park Rd., Elkland PA 16920, the client informed Adecco that it was considering bringing in a third vendor. The vendor referenced was Staffworks. One or more of the Former Employees have been on-site at this client checking in new Staffworks' associates to work there.

96.  On June 24, 2020, Fravel resigned effectively immediately, without notice, and while concealing that she would be working for Staffworks. When Fravel resigned, she informed the Senior Branch Manager in Adecco's Syracuse office that she would be working for a competitor in the Syracuse market. Fravel started working for Staffworks on or about June 24 and she is performing functions identical or substantially similar to her prior role at Adecco. Upon information and belief, Staffworks, Walser, Rodabaugh, and Standford solicited Fravel to work at Staffworks after receiving her Agreement and while knowing it would violate Fravel's restrictive covenants and other obligations owed to Adecco. Walser, Rodabaugh, and Standford made or participated in Staffworks's decision to hire Fravel.

97.  On June 24, 2020, Walser emailed Staffworks' Client Manager Krista Wardaugh, Client Manager Cheryl Humble, and Standford—which was inadvertently sent to Standford's Adecco account—asking where to send candidates as they come in and whether to send them "all" in one batch or in individual emails:[49]

-----Original Message-----
From: Karen Walser <karen.walser@icloud.com>
Sent: Wednesday, June 24, 2020 9:11 PM
To: Standford, Karen <Karen.Standford@adeccona.com>; Krista Wardaugh <KWardhaugh@staffworkscny.com>; Cheryl Humble <CHumble@staffworkscny.com>
Subject:

Hi guys. I am getting leahs emails. As I get candidates I will send them ?
Do I forward to all or send 1 to each of you and just keep going in order?
Sent from my iPhone

_____

[49] (Ex. 26, 6/24/20 Walser Email).

98.  Defendants have unsuccessfully attempted to solicit various other Adecco colleagues for employment at Staffworks in violation of the Former Employees' obligations. For instance, Adecco learned on June 24, 2020 that Walser was involved in offering Adecco's Branch Manager in its Jamestown Office a job at Staffworks.

99.  On June 25, 2020, Adecco learned that physical copies of all of Adecco's confidential Terms & Conditions with clients and sub-vendors were removed from a common area filing cabinet in its Elmira–Corning office (1 W Market St, Suite 401, Corning, NY 14830). It is unclear if and to what extent other documents and Confidential Information were removed. Although Adecco policy requires digital version to be uploaded to Microsoft SharePoint, digital copies were not maintained and—after extensive efforts to locate other versions—they cannot be found.

100.  On June 30, 2020, the Oswego County Workforce New York ("OCWNY") issued a Press Release titled "Staffworks CNY Hiring Event in Fulton July 9" announcing that OCWNY was "partnering with Staffworks CNY, a leading job placement agency in Central New York, to host a hiring event on Thursday, July 9" at 200 N. Second St. in Fulton, New York.[50] Staffworks' Operations Supervisor Karen Standford is quoted as stating, "Staffworks is the largest independently owned regional staffing services company in Central New York," "[w]e take great pride in connecting the right person with the right employment opportunity," and "[w]e continue to contribute to our employees' success by offering ongoing support and training." It also states that "Staffworks CNY is recruiting for the following positions in the Syracuse area" and lists openings for three positions in Baldwinsville and Syracuse.

101.  Walser, Rodabaugh, Rohde, Gloria, Flint, and Standford have failed to return and are still in possession of their Adecco-issued electronic devices. This includes: (1) laptops for Walser

---

[50] (Ex. 19, 6/30/20 Press Release).

(Device No. LTNAA2YQRMV2), Rodabaugh (Device No. TA58396484953), Rohde (Device No. LTNAA5M2G4Q2), Gloria (Device No. LTNAAG4SV3M2), Flint (Device No. LTNAA7W24JM2), and Standford (Device No. 7XGK1X2); (2) iPhone 8 cell phones for Walser, Gloria, Rohde, and Flint; and (3) the Adecco-issued iPad for Gloria. Adecco delivered UPS boxes and prepaid shipping labels to Walser, Rodabaugh, Rohde, Gloria, Flint, and Standford and delivery was confirmed to each.[51]

## IX.    The Former Employees' refusal to comply with their contractual obligations and Defendants' refusal to provide the confirmations requested by Adecco.

102.   On June 17, 2020, Adecco sent Staffworks, Walser, Rodabaugh, Rohde, Gloria, and Flint each Cease and Desist & Evidence Preservation letters reminding them of their post-employment restrictive covenants owed to Adecco, attaching their Agreements, and reminding them of the post-employment restrictive covenants owed to Adecco.[52] These letters noted that Adecco recently learned they were employed by Staffworks performing the same services they performed at Adecco in the prohibited area in direct competition with Adecco, soliciting Adecco clients and employees in violation of their Agreements, and improperly utilizing Adecco's Confidential Information.[53] They also instructed Defendants to preserve all potentially relevant evidence.[54]

103.   Adecco demanded that they immediately cease and desist breaching their obligations and provide the following confirmations by June 23, 2020:

- From Staffworks that it: (1) would no longer employ the Former Employees in a way that violates their Employment Agreements; (2) has taken steps to ensure

---

[51] Rodabaugh's box was delivered on May 20, 2020, Walser's box was delivered on June 11, 2020, Standford's box was delivered on June 15, 2020, Flint's box was delivered on June 19, 2020, Gloria's box was delivered on June 19, 2020, and Rohde's box was delivered on June 19, 2020.
[52] (Ex. 27, 6/17/20 Letters to Staffworks, Walser, Rodabaugh, Rohde, Gloria and Flint). In addition to the letter Adecco sent Staffworks, Adecco copied Staffworks on each of the letters to the Former Employees. (Id.).
[53] (Id.).
[54] (Id.).

it is not in possession of any Adecco Confidential Information; (3) has instructed the Former Employees to abide by their Agreements and not to solicit Adecco's customers or employees during the restricted periods; (4) will provide a list of all placements made by them since starting at Staffworks; (5) would provide a copy of any materials relating to any meetings the Former Employees had with Adecco's clients; and (6) would provide a list of Adecco colleagues hired since January 2020.

- From the Former Employees that they: (1) would honor the obligations in their Agreements; (2) have not solicited or attempted to solicit clients, employees, or contractors in violation of their Agreements; (3) provide the password to Adecco's Corning Facebook Page and/or reassign administrative access; and (4) have no Confidential Information or, alternatively, would identify and return any in their possession, custody, and/or control.

After learning Fravel and Standford also become employed at Staffworks in violation of their Agreements and were engaging in the same conduct, Adecco sent similar letters to them on June 25 & 26 respectively that demanded responses by June 29.[55]

104.  None of the Defendants made any attempt to respond to these letters or otherwise address Adecco's concerns. This refusal shows that despite the avalanche of evidence they do not take their contractual and preservation-of-evidence obligations seriously and they will continue to violate them absent immediate injunctive relief.

105.  On June 29, 2020, Adecco learned that instead of responding or making any attempt to refute or address *any* of Adecco's concerns—even the concerns about Confidential Information and property in their possession—they filed a declaratory judgment action on June 20 in the New York Supreme Court for the County of Oneida (Index No. EFCA2020-001).[56] The Complaint: (1) acknowledges Staffworks and Adecco are both "in the business of providing temporary employees to various employers" and therefore compete; (2) admits Walser, Rodabaugh, Rohde, Gloria, and Flint have "commenced employment with" Staffworks; (3) seeks a declaration as to Walser,

---

[55] (Ex. 296/25/20 Fravel Letter; Ex. 34, 6/26/20 Standford Letter).
[56] (Ex. 28, 6/20/20 Staffworks Oneida County Complaint)

Rodabaugh, Rohde, Gloria, and Flint's "rights to continue" their employment at Staffworks; (4) does not deny that they signed the Agreements; and (5) seeks a "declaration that Staffworks is free to compete" with Adecco "without limitation."[57]

106.  Defendants have never denied that Adecco's Confidential Information and company property is in their possession, custody, and/or control, including numerous emails and documents Walser forwarded to her personal email address and her husband's work email account, 11 Adecco-issued devices, the Terms & Conditions from the Elmira–Corning office, and various colleague personnel files forcibly removed from two locked cabinets in Adecco's Syracuse office. Nor have they denied that have and continue to solicit Adecco's clients, colleagues, associates, and candidates in violation of their Agreements.

107.  Defendants' brazen conduct is exactly the type of conduct that would enable a competitor like Staffworks to unlawfully target Adecco's existing and potential clients, candidates, associates, and colleagues and grievously harm Adecco's business. Considering Defendants' conduct, their knowledge of and relationships with Adecco's existing and potential clients, candidates, associates, and colleagues, and the relationships, goodwill, Confidential Information, trade secrets, and other assets at stake, Adecco is at imminent risk of immediately losing critical and substantial relationships, goodwill, and business, as well as further use and/or disclosure of Adecco's Confidential Information and trade secrets by a direct competitor. Adecco has suffered, and will continue to suffer, irreparable harm for which no adequate remedy at law exists given that Adecco's current loss is presently impossible to quantify or determine the full extent of, and Adecco has been left with no choice but to file suit and seek immediate injunctive relief.

108.  There are strong public interests in enforcing contracts, preventing unfair

---

[57] (Id. ¶¶ 8, 12, 16–17, 20).

competition, and protecting confidential information and trade secrets. Allowing Defendants'
conduct to go unchecked would nullify bargained-for restrictions, reward patently unscrupulous
conduct and unfair competition, and compromise significant investments in developing
longstanding customer relationships, goodwill, confidential information, and specialized
training.

109.    The investigation into Defendants' activities is ongoing. For instance, Adecco is
continuing to investigate the nature and scope of the Former Employees' activity in their Adecco
email accounts and in Adecco's proprietary databases leading up to their departures. Adecco has
engaged a qualified digital forensic expert prepared to forensically examine the 11 missing laptops,
iPhones, and iPad upon receipt. Although the COVID-19 pandemic has created some obstacles,
Adecco is in the process of providing Fravel's Adecco-issued laptop—the only device that has
been returned—to this expert for a forensic analysis. Adecco plans to present additional evidence
from its investigation to further support its existing allegations, claims, remedies, and requests for
injunctive relief, as well as to assert new claims, add new parties, or amend its pleadings as needed.

110.    Although Adecco has taken all available and reasonable steps to mitigate Defendants'
conduct, it continues to inflict irreparable harm. In connection with this action, Adecco has retained
the undersigned counsel and has agreed to pay counsel a reasonable fee in connection with these
services. To the extent any conditions precedent to this action exist, they have been satisfied,
waived, and/or would be futile.

## FIRST CLAIM FOR RELIEF
### Breach of Contract (Against the Former Employees Only)

111.    Adecco incorporates by reference all allegations in Paragraphs 1–110.

112.    The Former Employees each entered into, signed, and executed valid and enforceable
agreements with Adecco, including through their Employment Agreements and Rodabaugh's

Severance Agreement.

113.   These contracts and agreements were supported by adequate consideration that would be and were retained by them, the sufficiency of which they expressly acknowledged, including: as a condition of their employment and/or continued employment; continued employment that lasted for a substantial period; payments, commissions, benefits, and/or other compensation; increased status, skill, and knowledge; and other benefits.

114.   The restrictive covenants they agreed to be bound by were sought in good faith and were supported by legitimate business interests justifying the restrictions, including substantial relationships and goodwill with clients, candidates, and employees where there is a substantial risk of diverting business, specialized training and resources, evading unfair or illegal conduct that causes economic injury and "surreptitious commercial piracy," safeguarding valuable confidential information and trade secrets, and preventing loss to a competitor of employees whose services are special, unique, and/or extraordinary.

115.   The covenants are reasonably necessary, narrowly tailored, and no greater than necessary to protect Adecco' legitimate and protectable business interests, especially considering: the Confidential Information and trade secrets they would have access to and frequently accessed; that they would have and had direct and instrumental contact with existing and potential clients, candidates, associates, colleagues, and suppliers cultivated over many years; the longstanding and near-permanent clients of Adecco and client relationships they inherited from Adecco, were introduced to by Adecco, and/or whom they were provided the means and resources to develop by Adecco; the reasonable geographic limitations that are co-extensive with the market(s) they served while employed; the reasonable temporal limitations of one year for the non-compete covenant, one year for the non-solicitation of clients covenant, and one-year (Walser, Standford, Gloria,

Flint, and Fravel) or seven months (Rodabaugh and Rohde) for the non-solicitation of employees covenant; the nature of the services they would be offering and provided; that the restrictions would not unreasonably restrict their ability to secure gainful employment in their chosen occupations or impose undue hardship; and the lack of injurious harm to the public.

116. Absent these restrictions, Adecco cannot adequately protect its legitimate interests in its Confidential Information; trade secrets; goodwill; client, candidate, associate, colleague, and supplier relationships; and other business assets. Further, Adecco' legitimate interests would be compromised and competitors could unfairly compete.

117. Adecco performed all required terms, conditions, covenants, and promises.

118. The Former Employees breached their Agreements, restrictive covenants, and other obligations, and Defendants acted in concert, induced, aided, and abetted each other in these breaches, in various ways, including by:

    a. planning, organizing, assisting and/or working for and on behalf of a business in direct competition with Adecco in the prohibited market area before their coordinated resignations began;

    b. failing to faithfully devote all productive business time, energy, and skill to performing duties, including assisting a direct competitor in targeting and/or diverting existing and potential clients, candidates, associates, colleagues, and business opportunities;

    c. failing to refrain from engaging in any other business activity without Adecco's written consent and failing to abide by Adecco's policies and guidelines;

    d. using Adecco's resources for the benefit of Staffworks and/or themselves in the market area during and after their employment with Adecco;

    e. working in the market area prohibited under each of their Agreements for a direct competitor while performing and/or managing the same functions they performed and/or managed at Adecco in the same territories;

    f. directly and indirectly soliciting, contacting, calling upon, or attempting to solicit, contact, or call upon, existing and potential Adecco' clients they served or solicited while employed by Adecco, or that Adecco served in the market

area, to which they had access to Confidential Information and became aware of through their employment with Adecco, during the last year or one-and-a-half years of their employment, including Adecco's relationships with longstanding and near-permanent clients and relationships they inherited from Adecco, were introduced to them by Adecco, and/or whom they were provided the means and resources to develop by Adecco;

g.  directly and indirectly soliciting, hiring, recruiting, and attempting to solicit persons employed by or who had contracted with Adecco, whom they worked with in the market area and whom they had personal contact with through their employment, during the last year of their employment; and

h.  directly and indirectly using, disclosing, taking, destroying, reproducing, concealing, and/or failing to immediately return Adecco's Confidential Information, property, electronic devices, Terms & Conditions, colleague personnel files, and business information for the benefit of a direct competitor, themselves, and/or third parties during and after their employment without authorization.

Further, each Former Employee aided and abetted each other Defendants in committing the wrongful conduct alleged herein.

119.  A presumption of irreparable harm exists where a former employee breaches a non-compete, non-solicitation, or confidentiality/non-disclosure covenant, as well as when confidential information or trade secrets are at stake. This is because the threat of harm and injuries that flow from these circumstances are significant, typically cannot be undone, and it is often impossible to quantify or prove the extent of the goodwill, clients, business, and confidential information lost.

120.  With respect to the Agreements governed by Florida law, violations of restrictive covenants create a presumption of irreparable injury under Fla. Stat. 542.335(1)(j). Further, Adecco is entitled to the recovery of its reasonable attorneys' fees and costs incurred in connection with this action pursuant to Fla. Stat. 542.335(1)(k).

121.  As a direct and proximate result of the Former Employees' breaches, Adecco has suffered and will continue to suffer irreparable harm as a result of losing existing and potential clients, candidates, associates, colleagues, business opportunities, suppliers, equipment,

competitive advantages, Confidential Information, goodwill, and other assets, as well as damages and other harm.

122.  WHEREFORE, Adecco requests temporary, immediate, preliminary, and permanent injunctive relief to prevent further breaches. These remedies would not be available, effective, or adequate except through this action. In addition, Adecco seeks any other available relief and damages available under their Agreements, allowed by law, or that this Court deems just and proper, including reasonable attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**Tortious Interference with Contract**
**(Against Staffworks, Vitullo, Walser, Rodabaugh, and Standford)**

123.  Adecco incorporates by reference all allegations in Paragraphs 1–110.

124.  Adecco entered into valid and enforceable contracts with clients, employees, and suppliers.

125.  The Former Employees each entered into and executed valid and enforceable agreements and contracts with Adecco, including through their Employment Agreements and Rodabaugh's Severance Agreement.

126.  Staffworks, Vitullo, Walser, Rodabaugh, and Standford knew or should have known under the circumstances that Adecco entered into valid and enforceable agreements with each of the Former Employees before they were hired at Staffworks. They also knew or should have known that Adecco entered into valid and enforceable contracts with clients, employees, and suppliers.

127. In addition to Staffworks, Vitullo, Walser, Rodabaugh, and Standford having knowledge of the Agreements and the Former Employees' obligations owed to Adecco based on its discussions with the Former Employees before they were hired and other circumstances, Staffworks, Vitullo, Walser, Rodabaugh, and Standford were separately informed of the Former

Employees' obligations and provided their Agreements through pre-suit correspondence from Adecco. Despite this, Staffworks continued to employ the Former Employees in capacities that violate their Agreements.

128. Staffworks, Vitullo, Walser, Rodabaugh, and Standford intentionally, willfully, maliciously, and without privilege or justification interfered with, instigated, and caused breaches of the Former Employees' valid and enforceable contracts with Adecco, as well as breaches of Adecco's valid and enforceable contracts with clients, employees, and suppliers. Further, each Former Employee aided and abetted each of the other Defendants in committing this wrongful conduct.

129. As a direct and proximate result, Adecco has and will continue to suffer irreparable harm as a result of losing existing and potential clients, candidates, associates, colleagues, business opportunities, suppliers, competitive advantages, Confidential Information, goodwill, and other assets, as well as damages and other harm.

130. WHEREFORE, Adecco requests temporary, immediate, preliminary, and permanent injunctive relief to prevent further interference and other harm. These remedies would not be available, effective, or adequate except through this action. In addition, Adecco seeks any other available relief and damages allowed by law or that this Court deems just and proper.

### THIRD CLAIM FOR RELIEF
**Tortious Interference with Business Relationships/Prospective Economic Advantage**
**(Against All Defendants)**

131. Adecco incorporates by reference all allegations in Paragraphs 1–110.

132. Adecco has valid and existing and/or prospective economic relationships, business relationships, and opportunities with existing and potential clients of which Defendants were aware.

133. Defendants intentionally, willfully, maliciously, and without privilege or justification

interfered with Adecco' existing and/or prospective economic relationships, business relationships, and opportunities and induced or otherwise caused a failure to enter into, disruption, termination, and violations of various opportunities and obligations with Adecco. Further, each Former Employee aided and abetted each of the other Defendants in committing this wrongful conduct.

134. As a direct and proximate result of Defendants' conduct, Adecco has and will continue to suffer irreparable harm as a result of losing existing and potential clients, candidates, associates, colleagues, business opportunities, suppliers, competitive advantages, Confidential Information, goodwill, and other assets, as well as damages and other harm.

135. WHEREFORE, Adecco requests temporary, immediate, preliminary, and permanent injunctive relief to prevent further interference and other harm. These remedies would not be available, effective, or adequate except through this action. In addition, Adecco seeks any other available relief and damages allowed by law or that this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### Actual and Threatened Trade Secret Misappropriation Under Federal and State Law
### (Against All Defendants)

136. Adecco incorporates by reference all allegations in Paragraphs 1–110.

137. The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. 1831 *et seq.*, state-law Uniform Trade Secrets Act, and/or common law prohibit the unauthorized acquisition, disclosure, use, conversion, and misappropriation of trade secrets and authorize injunctions based on actual or threatened misappropriation.

138. Adecco' trade secrets include its: lists and reports identifying existing and/or prospective clients, candidates, and colleagues; company-wide, market-by-market, industry, and client and colleague profitability, margin, cost, pricing, and related financial information, metrics, trends, and analyses; KPI reports; aggregated data regarding client visits, client proposals, client

wins, "Effectiveness" ratio (new clients/visits), breakdown of total business activity, and new clients billed; client and candidate placement and status information; compensation, commission, and bonus plans, structures, and methodologies; company-wide, market-by-market, industry, and client and colleague strategy, growth, opportunity, and target information; marketing plans and projections; creative client, consultant, and supplier service arrangements, structures, pricing, profiles, and terms and conditions; the identities of key client decision-makers; client and decision-maker specialized needs, preferences, and requirements; colleague performance and evaluation information; databases containing unique and non-public candidate resumes and job orders, descriptions, and compensation information; personnel files; approaches for capturing, analyzing, and effectively utilizing information for existing and potential clients, candidates, associates, and colleagues; and strategies for recruiting, vetting, and placing candidates and associates across a wide range of clients, industries, markets, and positions.

139. This information and these strategies and methodologies derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable by proper means by, competitors and other persons who can obtain economic value from their disclosure or use. They are also unique, not publicly or readily available, not known or shared in the market, are extremely valuable, provide numerous competitive advantages in the market, and would enable competitors to unfairly compete by avoiding the substantial efforts invested by Adecco over many years to cultivate them, undercutting Adecco' pricing, and targeting clients, suppliers, colleagues, and candidates.

140. Adecco has made reasonable and diligent efforts to maintain and protect its trade secrets including by: (i) storing them in secure, password-protected databases and programs and on secure servers; (ii) requiring personalized passwords and/or two-factor authentication; (iii)

limiting distribution or access rights to persons obligated to maintain the confidentiality and only to the extent necessary to perform their jobs; (iv) specialized security training; (v) requiring as a condition of employment compliance with Employment Agreements, a Colleague Handbook and Code of Conduct, and various other policies and procedures; and (vi) explicitly marking certain documents and information "confidential," "trade secret," and "proprietary."

141. Adecco' trade secrets are related to products and services used in, or intended for use in, interstate or foreign commerce.

142. Defendants actually misappropriated Adecco' trade secrets by acquiring them from Adecco through theft, misrepresentation, each other, and breaches of various duties to maintain secrecy and limit use, and by using and disclosing them without authorization, including through:

- Walser's June 1, 2020 email at 1:31 pm attaching spreadsheets titled "**[REDACTED]** WC 2018 2018 to current.xls" and "**[REDACTED]** Agency Payrates at **[REDACTED]**- **[REDACTED]** Q4 2019-2020.xlsx, which she forwarded to her husband's work email account;"

- Walser's two June 1, 2020 emails at 5:42 pm and the "Sales Colleagues KPIs 05.31.20.xlsx" spreadsheet, which she sent to her personal email account and husband's work email account;

- Walser's 2020 Branch "Planning Worksheets" for six branches ("Beachwood Planning Worksheet.xlsx," "Planning Worksheet Jamestown (2).xlsx," "Planning Worksheet Buffalo.xlsx," "Felix Planning Worksheet rev (003).xlsx," and Copy of Planning Worksheet rev 2.xlsx"), which she forwarded to her husband's work account; and

- Failing to return and retaining Walser, Rodabaugh, Rohde, Gloria, Flint, and Standford's Adecco-issued laptops, Gloria and Rohde's Adecco-issued cell phones, and Gloria's Adecco-issued iPad in violation of their Agreements and after Adecco sent letters demanding the return of any company property in their possession, custody, and/or control.

143. Defendants also misappropriated Adecco's trade secrets by acquiring them from one another while knowing or having reason to know they were acquired using improper means; conspiring to use improper means; and by using, disclosing, and retaining them without

authorization.

144.  The timing, facts, and other circumstances surrounding Defendants' conduct shows it was intentional, deliberate, willful, malicious, and in bad faith, done at the direction of, aided and abetted by, and/or with the knowledge of Staffworks, Vitullo, and the other Former Employees, without any basis that it furthered the Former Employees' work at Adecco, designed to harm Adecco, and to enable Defendants to unfairly compete.

145.  Defendants have continued to disclose, use, and furnish Adecco' trade secrets to and for the benefit of Staffworks, Vitullo, and the Former Employees to enable them to unlawfully and unfairly compete.

146.  Each of the Defendants threaten further disclosure and use of Adecco' trade secrets for numerous reasons, including that:

a)  numerous emails, spreadsheets, and other electronic and physical documents containing Adecco' trade secrets and/or Confidential Information—many of which the Former Employees acquired in their final days or hours at Adecco—remain in Defendants' possession, custody, and/or control, in their personal email account(s), and/or in the work account of Walser's husband;

b)  They are currently in possession of 11 Adecco-issued electronic devices in violation of their Agreements and after Adecco sent letters demanding they identify and return company property;

c)  the Former Employees are working for a direct competitor of Adecco, and together, while soliciting Adecco' clients, colleagues, and candidates;

d)  Gloria, Flint, and Rohde planned their conduct and coordinated their departures, with the knowledge and assistance of Staffworks before they resigned to allow them to further solicit Adecco' clients and colleagues and stockpile Adecco' trade secrets and Confidential Information for the benefit of Staffworks and/or themselves;

e)  the Former Employees took numerous steps to conceal their conduct before resigning including by intentionally deleting emails and other relevant evidence, misrepresenting the reason(s) for their resignations, and/or failing to disclose that they would be working for a direct competitor; and

f) each of the Defendants failed to confirm through pre-suit correspondence that Adecco's trade secrets, Confidential Information, and property (i) was not in their possession, custody, and/or control, much less identify any that was; (ii) was not improperly used, disclosed, or obtained by Defendants before or after their resignations; or (iii) would not be used or disclosed by them in the future.

147. As a direct and proximate result of Defendants' actual and threatened misappropriation, Adecco has and will continue to suffer irreparable harm and as a result of losing existing and potential clients, candidates, associates, colleagues, business opportunities, suppliers, competitive advantages, trade secrets, Confidential Information, goodwill, and other assets, as well as damages and other harm.

148. WHEREFORE, Adecco requests temporary, immediate, preliminary, and permanent injunctive relief to prevent further disclosure, use, misappropriation, and threatened misappropriation. These remedies would not be available, effective, or adequate except through this action. In addition, Adecco seeks any other available relief and damages allowed by law or that this Court deems just and proper, including reasonable attorneys' fees and costs.

### FIFTH CLAIM FOR RELIEF
### Conversion (Against All Defendants)

149. Adecco incorporates by reference all allegations in Paragraphs 1–110.

150. Adecco has, and at all times had, an absolute and exclusive right in its property, including its Adecco Corning Facebook Page, account, and all intellectual property contained therein, as well as company documents stored in its offices.

151. Defendants wrongfully and without authorization assumed control, dominion, and ownership over the property.

152. This conduct was separate and apart from any actual or threatened misappropriation of Adecco's Confidential Information and trade secrets.

153. Adecco demanded possession of the property, including through Cease and Desist &

Evidence Preservation letters sent to Defendants. For instance, a June 17, 2020 letter to Gloria demanded that she "provide the password to Adecco's Corning Facebook page and/or reassign administrative access to the page to the individual(s) designated by Adecco."

154. As a direct and proximate result of the Former Employees' breaches and conduct, Adecco has and will continue to suffer damages, irreparable harm for which it is entitled to temporary, immediate, preliminary, and permanent injunctive relief to prevent further harm. Absent such relief, any award would be ineffectual. In addition, Adecco seeks all other available damages and relief allowed by law, including attorney fees, exemplary damages, punitive damages, and compensatory damages.

155. WHEREFORE, Adecco requests temporary, immediate, preliminary, and permanent injunctive relief to prevent further disclosure, use, misappropriation, and threatened misappropriation. These remedies would not be available, effective, or adequate except through this action. In addition, Adecco seeks any other available relief and damages allowed by law or that this Court deems just and proper, including reasonable attorneys' fees and costs.

### SIXTH CLAIM FOR RELIEF
### Trademark Infringement and Unfair Competition under the Lanham Act
### (Against All Defendants)

156. Adecco incorporates by reference all allegations in Paragraphs 1–110.

157. Adecco is the owner of valid and protectable registered trademarks.

158. Defendants infringed upon Adecco's trademarks by adopting and using Adecco's trademarks without permission or authorization—in connection with services used in, or intended for use in, interstate commerce that were identical or closely related to those provided by Adecco— causing a likelihood of confusion, mistake, and deception as to whether Defendants, "Fingerlakes Staffing," "Staffworks Upstate NY & PA Staffing," and/or their services were affiliated with,

approved by, in partnership with, sponsored by, approved by, or were otherwise associated with or originated from Adecco. Among other things, Defendants' adoption and use of the infringing marks constitute a false designation of origin and/or a false and misleading description of services.

159. Defendants' willfully, maliciously, fraudulently, deliberately, and in bad faith infringed upon Adecco's valid and protectable trademarks.

160. As a direct and proximate result of the Former Employees' breaches and conduct, Adecco has and will continue to suffer damages, irreparable harm for which it is entitled to temporary, immediate, preliminary, and permanent injunctive relief to prevent further harm. Absent such relief, any award would be ineffectual. In addition, Adecco seeks all other available damages and relief allowed by law and 15 U.S.C. 1117(a), including attorney fees, exemplary damages, punitive damages, disgorgement of profits, compensatory damages, and costs.

161. WHEREFORE, Adecco requests temporary, immediate, preliminary, and permanent injunctive relief to prevent further disclosure, use, misappropriation, and threatened misappropriation. These remedies would not be available, effective, or adequate except through this action. In addition, Adecco seeks any other available relief and damages allowed by law, 15 U.S.C. 1117(a), or that this Court deems just and proper, including reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

162. **WHEREFORE**, Adecco demands the following relief:

A. Temporary, immediate, preliminary, and/or permanent injunctive relief:

1.    Enjoining Defendants and those acting in concert with them from directly or indirectly destroying, hiding, deleting, damaging, converting, or otherwise disposing of any of Adecco' Confidential Information, trade secrets, business information or records, equipment, supplies, tangible property, intangible property, or potentially relevant evidence within their possession, custody, and/or control, including any such information contained in computers,

mobile phones, business or personal email accounts, cloud-based storage accounts, text messages, and other electronic devices.

2.      Enjoining the Former Employees and those acting in concert with them from directly or indirectly, within the market area defined by their Agreements, entering into, engaging in, being employed by, consulting or rendering services for Staffworks, or any of its trade names or brands, in a capacity performing functions similar to those performed or managed by them while employed by Adecco and in violation of their Agreements.

3.      Enjoining the Former Employees from directly or indirectly soliciting, contacting, calling upon, or attempting to solicit, contact, or call upon, existing or potential Adecco' clients they served or solicited while employed by Adecco, or that Adecco served in the market area in violation of their Agreements.

4.      Enjoining the Former Employees from directly or indirectly soliciting, hiring, recruiting, or attempting to solicit, hire, or recruit, persons employed by or who had contracted with Adecco who they worked with in the market area, or with whom they had personal contact through their employment, during the last 12 months of their employment.

5.      Enjoining the Former Employees and those acting in concert with them from directly or indirectly, on behalf of themselves or any person or entity, from attempting to induce any client or potential client to terminate its relationship with Adecco.

6.      Enjoining Defendants and those acting in concert with them from directly or indirectly using, disclosing, or further converting Adecco's Confidential Information, trade secrets, and company property.

7.      Enjoining Defendants and those acting in concert with them from refusing or failing to return to Adecco any Confidential Information, trade secrets, or company property in their possession, custody, and/or control, including electronic information.

8.      Enjoining Defendants and those acting in concert with them from tortiously interfering with Adecco's contractual relationships, business relationships, and business opportunities with any of Adecco's existing or potential clients.

9.      Ordering that the durational restrictions for the Former Employees' non-compete and non-solicitation provisions are tolled and/or equitably extended from the dates of each of their resignations through the date of when an injunction is entered.

B.      Disgorgement, recoupment, and repayment of the Former Employees' compensation from Adecco between when their unlawful conduct began and each of their resignations.

C.      An award of compensatory damages;

D.      An award of exemplary and statutory damages;

E.      An award of punitive damages;

F.      An award of pre-judgment interest and post-judgment interest;

G.      An award of attorney's fees; and

H.      Any other relief this Court deems just or proper.

Date:    July 2, 2020s

Respectfully submitted,

_/s/ John Mills_____
John T. Mills, Esq.
**GORDON REES SCULLY MANSUKHANI LLP**
One Battery Park Plaza, 28th Floor
New York, New York 10004
T: (212) 269-5500; F: (212) 269-5505
jtmills@grsm.com

Tyler Tarney (*Pro Hac Vice Forthcoming*)
Mary Csarny (*Pro Hac Vice Forthcoming*)
41 South High Street, Ste 2495
Columbus, Ohio 43215
T: (614) 340-5558; F: (614) 360-2130
ttarney@grsm.com
mcsarny@grsm.com

*Counsel for Plaintiffs Adecco USA, Inc. and ADO Staffing, Inc.*


## **JURY DEMAND**

Adecco requests a jury with the maximum number of jurors allowed by law.

_/s/ John Mills_____
John Mills